## Frank Streich, Appellant, v. General Motors Corporation, Appellee.

### Gen. No. 46,471.

First District, Second Division.

April 6, 1955.

Released for publication May 23, 1955.

Robert J. Gorman, of Chicago, for appellant.

Pope & Ballard, of Chicago, for defendant-appellee; Ferris E. Hurd, John R. Whitman, and Parker L. Jacobson, all of Chicago, of counsel.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

This is an appeal from an order of the circuit court of Cook county sustaining a motion to dismiss the plaintiff's fifth amended complaint. The complaint was filed in an action for damages occasioned by the defendant's alleged wrongful cancellation of a contract.

Plaintiff's theory on appeal is that there was as a matter of law a binding contract between the parties as set out in the amended complaint. The theory of the defendant is that the plaintiff had declared on an alleged contract which, on the face of the complaint, was not sustainable.

In the plaintiff's fifth amended complaint he alleged that the defendant had entered into a written contract with the plaintiff for certain air magnet valves, as evidenced by defendant's purchase order No. 11925, which order was accepted by the plaintiff; that attached thereto as a part thereof were release and shipping schedule No. 478412 and a letter dated April 1, 1948; that the letter "in addition to explaining the operation of the aforesaid documents states that the said purchase order was 'for our requirements from September 1, 1948 to August 31, 1949.'" It is further alleged that about the time aforesaid "the plaintiff was orally told by the defendant through its authorized agent or agents that their requirements for the said year would be approximately 1,600 units of the said item"; that the requirements of the defendant were in excess of 1,600 units and were for previous years approximately 1,600 units; that the plaintiff supplied the defendant with all or part of the said previous requirements.

In the complaint it is also set out that "in the alternative the said purchase order had written thereon that it was issued 'to cover shipments to be received by us from September 1, 1948 to August 31, 1949 as released'"; that it is implied from the said statement that the shipments would be released to the plaintiff, and in explanation of said written statement that plain-

tiff was advised by the defendant that it would release approximately 1,600 units for shipment under the said purchase order. The plaintiff also alleges that in accordance with the terms of and in reliance upon and in consideration of the said contract and the statements of the agent of the defendant, the plaintiff purchased divers materials for the said items and performed divers and large amounts of labor on the said divers materials in and about endeavoring to prepare the said units for assembly and delivery to the defendant and plaintiff did special and costly tooling and machinery work.

A motion to dismiss the complaint was filed by the defendant, in which, among other things, it was alleged that purchase order No. 11925 shows on its face that the plaintiff need not make or deliver, and that the defendant need not buy, any air magnet valves as therein identified, except when and as specified in written releases issued by the defendant; that purchase order release and shipping schedule No. 478412 discloses on its face that the defendant was committed to buy, and the plaintiff to make and sell, a total of only 12 such air magnet valves. The motion also sets out that the plaintiff's claim as to an agreement by the defendant to purchase air magnet valves other than the 12 referred to is in direct conflict with the provisions of the alleged contract upon which the plaintiff is suing, in that there is therein a provision stating that it is the complete and final agreement between the parties; that any claim of the plaintiff as to such alleged agreement can only be based on further written releases by the defendant, none of which are stated to have been made; that the plaintiff's claim of an agreement by defendant to buy air magnet valves, other than those specified in the alleged written contract sued upon, is based upon an alleged oral agreement which is inadmissible under the parol evidence rule and unenforceable by virtue of the statute of frauds.

The trial court sustained defendant's motion and dismissed the suit. No request was made by the plaintiff to plead over.

There were three exhibits attached to the complaint. Purchase order No. 11925 provided that it was a purchase order for air magnet valves, drawing 8024271 Rev. A, at a price of $13.50 net each. On the face of the purchase order it was provided:

"This Purchase Order is issued to cover shipments of this part, to be received. by us from September 1, 1948 to August 31, 1949 as released and scheduled on our series 48 'Purchase Order release and Shipping Schedule' No. 478412 attached and all subsequent Purchase Order releases."

"The total quantity covered by this Purchase Order will always be included in the amount shown under 'Total Released' on the latest 'Purchase Order Release and Shipping Schedule.' "

This order was dated April 19, 1948. It provided that the order, including the terms and conditions on the face and reverse side, constitute "the complete and final agreement between Buyer and Seller and no other agreement in any way modifying any of said terms and conditions will be binding upon Buyer unless made in writing and signed by Buyer's authorized representative."

On the reverse side are 23 provisions, among which are the. following:

"The contract resulting from the acceptance of this order is to be construed according to the laws of the state. . . . This contract is non-assignable by Seller."

"Deliveries are to be made both in quantities and at times specified in schedules furnished by Buyer. Buyer will have no liability for payment for material or items

delivered to Buyer which are in excess of quantities specified in the delivery schedules. Buyer may from time to time change delivery schedules or direct temporary suspension of scheduled shipments."

"Buyer reserves the right to cancel all or any of the undelivered portion of this order if Seller does not make deliveries as specified in the schedules, or if Seller breaches any of the terms hereof including the warranties of Seller."

"Unless otherwise herein agreed, Seller at its own expense shall furnish, keep in good condition and replace when necessary all dies, tools, gauges, fixtures and patterns necessary for the production of the material ordered. . . . Buyer has the option, however, to take possession of and title to any dies, tools, gauges, fixtures and patterns that are special for the production of the material covered by this order and shall pay to Seller the unamortized cost thereof; provided, however, that this option shall not apply if the material hereby ordered is the standard product of Seller or if a substantial quantity of like material is being sold by Seller to others."

Purchase order release and shipping schedule No. 478412 contained the following listings:

| Purchase Orders | | | | | Receipts | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Date | | Total | | Last Receipt Considered | |
| Number | Series | Mo. | Day | Yr. | Quantity Rec'd. | Meas. | Quantity | Date |
| 10853 | 47 | 11 | 18 | 7 | 75 | PC | 64 | 3/9/8 |
| 11925· | 48 | | | | | | | |

| Shipping Instructions | | Apply Against P. O. Series |
|---|---|---|
| 4A at once | 132 PC | 47 |
| Apr. | 462 | |
| May | 32 | |
| Jun | 4 | |
| Jul | 4 | |
| Aug | 4 | |
| Unscheduled | 12 | 48 |

490

At the bottom of the form appear the following:

| Total Released | Previously Released | Balance Due | Increase in Release |
|---|---|---|---|
| 725 | 709 | 650 | 16 |

Under a column headed "remarks" we find the following: "am released on 1/(?)/48 schedule is 648 plus 61 units increase to (?)/(?)/48 schedule or 709 units." From this an arrow is drawn to the figure "709" under "Previously Released." There is a stamp across the face of the order "Please Acknowledge," and another stamp, "DO NOT Fabricate Unscheduled Quantities— Released for Raw Material Only." This order was dated March 31, 1948.

Accompanying both orders was a letter dated April 1, 1948, on the letterhead of the Electro-Motive Division, General Motors Corporation, which reads as follows:

"To All Suppliers

"Subject: 'OPEN END' PURCHASE ORDER

"Last July, we inaugurated our 'Open End' purchase order procedure whereby one purchase order is issued per part per year. Orders issued since that time have covered our requirements from September 1, 1947, through August 31, 1948. Because old style, specific quantity, purchase orders were still in existence, our purchase order releases and shipping schedules had to make provision for both the old style and the new 'Open End' purchase orders. With the completion of all old style orders, it is now possible to use the final 'Open End' purchase order release and shipping schedule form, beginning with the present 4A (April) releases.

"With the new form, we can supply you with more complete information regarding our 'Open End' purchase order releases. Instead of merely showing 'Amount Released' as on the previous form, the latest

491

revision shows 'Total Release,' 'Previously Released,' 'Balance Due,' and 'Increase in Release,' using an asterisk to denote a decrease in release. More detailed information regarding receipts against 'Open End' orders is also furnished, since the quantity and date of last receipt is shown in addition to the total quantity received.

"The original 'Open End' purchase order, designated as the 47 series, covered our requirements through August 31, 1948, only. Where requirements are released beyond that date, it now becomes necessary to issue our 48 series 'Open End' purchase order for our requirements from September 1, 1948, through August 31, 1949. *All scheduled quantities applied against the 47 purchase order series indicated by a 47 in the 'Apply Against P. O. Series' column, must be shipped and invoiced against the 47 series purchase order. All quantities shipped to reach our plant after August 31, 1948, must be shipped and invoiced against the new 48 series 'Open End' purchase order.* Strict adherence to these instructions is necessary for successful operation of the 'Open End' purchase order plan.

"If you have any questions concerning the operation of this new purchase order plan, please call on us at once.

"Yours very truly,
(signed) M C McGowan
M. C. McGowan
Purchasing Agent"

On April 19, 1948 order No. 11925 was cancelled by the defendant.

It is the contention of the plaintiff, Frank Streich, hereafter referred to as "seller," that the defendant, General Motors Corporation, hereafter referred to as the "buyer," had entered into a binding contract to purchase all the requirements of the buyer from September 1, 1948 through August 31, 1949 from the seller, and that, while the amount of the requirements was

492

not specified, parol evidence might be properly introduced to show what the requirements were. The seller further contends that there was, under order 11925, a total of 725 units released, since "725" is shown in the column "Total Released" on purchase order release and shipping schedule No. 478412, relying upon the provision in purchase order No. 11925, which says that the total quantity covered by that purchase order will always be included under the designation "Total Released" in the latest purchase order release and shipping schedule.

In order to determine whether or not the seller stated a cause of action in his complaint it is necessary to analyze the agreements between the parties.

■ There is no question but that under the law a contract properly entered into whereby the buyer agrees to buy all its requirements of a commodity for a certain period, and the seller agrees to sell the same as ordered, is a valid and enforceable contract and is not void for uncertainty and want of mutuality. Minnesota Lumber Co. v. Whitebreast Coal Co., 160 Ill. 85; Match Corp. of America v. Acme Match Corp., 285 Ill. App. 197; Williston on Contracts, Rev. Ed., Vol. 1, Sec. 104, p. 351. The contract in the instant case is not such a contract. Purchase order No. 11925 states that it is issued to cover "shipments of this part, to be received by us from Sept. 1, 1948 to August 31, 1949 as released and scheduled on our series 48 'Purchase Order release and Shipping Schedule' No. 478412 attached and all subsequent Purchase Order releases." Construing the letter of April 1, 1948 as an integral part of the contract, the provisions therein contained are merely that it "now becomes necessary to issue our 48 series 'Open End' purchase order for our requirements from September 1, 1948, through August 31, 1949." Reading and construing the two documents together, notwithstanding the detailed provisions contained on the reverse side of the purchase order, the

result is an agreement on the part of the seller to sell a certain identified valve at a certain fixed price in such quantities as the buyer may designate, when and if it issues a purchase order for the same. The word "release" as used throughout these documents is treated by both parties as equivalent to "order."

In Corbin on Contracts, Vol. 1, Sec. 157, the author says:

"In what purports to be a bilateral contract, one party sometimes promises to supply another, on specified terms with all the goods or services that the other may order from time to time within a stated period. A mere statement by the other party that he assents to this, or 'accepts' it, is not a promise to order any goods or to pay anything. There is no consideration of any sort for the seller's promise; and he is not bound by it. This remains true, even though the parties think that a contract has been made and expressly label their agreement a 'contract.' In cases like this, there may be no good reason for implying any kind of promise by the offeree. Indeed, the proposal and promise of the seller has the form of an invitation for orders; and the mode of making an operative acceptance is to send in an order for a specific amount. By such an order, if there has been no previous notice of revocation, a contract is consummated binding both parties. The standing offer is one of those that empowers the offeree to accept more than once and to create a series of separate obligations. The sending in of one order and the filling of it by the seller do not make the offer irrevocable as to additional amounts if the parties have not so agreed."

See also Williston on Contracts, Rev. Ed., Vol. 1, Sec. 104A.

■■■ Here, the buyer proffers purchase order 11925, with its 25 or more clauses, to the seller for acceptance. In the instrument it makes no promise to

do anything. On the surface it appears to be an attempt to initiate a valid bilateral contract. The seller accepts, and as by a flash of legerdemain the positions of the buyer and the seller shift. The buyer now becomes the promisee and the seller the promisor. The promise of the seller to furnish identified items at a stated price is merely an offer and cannot become a contract until the buyer issues a release or order for a designated number of items. Until this action is taken the buyer has made no promise to do anything, and either party may withdraw. The promise is illusory, and the chimerical contract vanishes. "An agreement to sell to another such of the seller's goods, wares and merchandise as the other might from time to time desire to purchase, is lacking in mutuality because it does not bind the buyer to purchase any of the goods of the seller, as such matter is left wholly at the option or pleasure of the buyer. Willard Sutherland & Co. v. United States, 262 U. S. 489, 67 L. Ed. 1086; Atwater & Co. v. United States, 262 U. S. 495, 67 L. Ed. 1089; Cohen v. Clayton Coal Co, 86 Colo. 270, 281 Pac. 111, 74 A. L. R. 467; Schlegel Mfg. Co. v. Peter Cooper's Glue Factory, 231 N. Y. 459, 132 N. E. 148, 24 A. L. R. 1348 (also annotations in 14 A. L. R. 1303, et seq.)." Peru Wheel Co. v. Union Coal Co., 295 Ill. App. 276. See also Alexander Hamilton Institute v. Jones, 234 Ill. App. 444.

In Higbie v. Rust, 211 Ill. 333, the court says:

"Where there is no consideration for the promise of one party to furnish or sell so much of the commodity as the other may want, except the promise of the other to take and pay for so much of the commodity as he may want, and there is no agreement that he shall want any quantity whatever, and no method exists by which it can be determined, whether he will want any of the commodity, or, what quantity he will want, the contract is void for lack of mutuality. Hoffman v. Maffioli, 104 Wis. 630; Bailey v. Austrian, 19 Minn. 535; National Furnace Co. v. Keystone Manf. Co., 110 Ill. 427."

See also Williston on Contracts, Rev. Ed., Vol. 1, Sec. 49 (p. 138) and Sec. 104 (p. 349). In the instant case, when the seller accepted purchase order No. 11925, no contract came into being.

█ The agreement in question is an adaptation of what was termed an "open end contract," which was used extensively by the federal government during the late war. However, it was used only in cases where the commodities dealt with were staples and either in the possession of or easily accessible to the seller. In this case the use of the contract is shifted and extended to cover commodities which must be manufactured before they are available for sale. According to the admitted statements in the complaint, special tools had to be manufactured in order to produce the item herein involved. The seller here, misled by the many and detailed provisions contained in purchase order No. 11925 and ordinarily applicable to an enforceable bilateral contract, undoubtedly, as he alleged in his complaint, did go to considerable expense in providing tools and machines, only to find that by the accepted agreement the buyer had promised to do absolutely nothing. A statement of expectation creates no duty. Courts are not clothed with the power to make contracts for parties, nor can they, under the guise of interpretation, supply provisions actually lacking or impose obligations not actually assumed.

The seller argues strenuously that purchase order release and shipping schedule 478412 designated 725 items as released under purchase order 11925. The contention is that since purchase order 11925 provided "the total quantity covered by this Purchase Order will always be included in the amount shown under 'Total Released' on the latest 'Purchase Order Release and Shipping Schedule,' " and since on that order and release the figure "725" appears in the column "Total Released," it should be interpreted as meaning that the 725 items are released under order 11925. A care-

496

ful reading of the provision in the latter does not support such an interpretation. All that provision requires is that all items released under order 11925 shall be included in the column. It does not say that no other items can also be set out therein. The buyer points out that the figure 725 includes some items released under a former contract, together with 12 items released under the instant contract. On the face of the instrument this is apparent, and is in accord with the interpretation indicated in the letter of April 1, 1948 and with the provision in order 11925.

■■ The seller also argues that the court should not have dismissed the suit since it is admitted by the buyer that 12 items had been released under the contract. At the time the trial court entered the order of dismissal the seller did not ask for leave to file an amended complaint. After dismissal, leave to plead over is a matter of discretion with the court and is not a matter of right. Hackman v. City of Staunton, 190 Ill. App. 545. This was a dismissal of the fifth amended complaint filed by the plaintiff. Even if the plaintiff had asked leave to plead over, refusal by the trial court could hardly be said to have been an abuse of discretion.

■ The seller also argues the fact that he has alleged in his complaint he was advised by the defendant it would release approximately 1,600 units for shipment under the said purchase order. The written purchase order 11925 contains a provision that the terms and conditions thereof are the complete and final agreement between the buyer and the seller. In Metropolitan Life Ins. Co. v. Schwarz, 310 Ill. App. 205, in passing on a similar clause, the court says:

"In Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co., 334 Ill. 281, wherein the Supreme Court in passing upon a contract similar to this one, at page 290, said: 'If a written contract purports on its face to be a complete expression of the whole agreement

497

it is to be presumed that the parties introduced into it every material item and term, and parol evidence is not admissible to add another term to the agreement about which the contract is silent. . . . In the instant case any such rights, duties or liabilities which would arise by implication of law are specifically negatived by the provisions which each contract contains, "there are no understandings or agreements relative to this contract or its subject matter that are not fully expressed herein." . . . The clause of the contract just quoted not only negatives the fact that there are any contemporaneous parol understandings or agreements existing between the parties relative to the contract, but also expressly negatives the fact that there are any understandings, whether arising by implication of law or otherwise, between the parties as to the subject matter of the contract,—i. e., as to the coal itself which is the subject matter of the contract. This clause of the contract is just as binding upon the parties as any other clause and the municipal and Appellate Courts had no right to disregard it.' See also Armstrong Paint & Varnish Works v. Continental Can Co., 301 Ill. 102."

In the instant case the seller argues that the suit should not be dismissed because if the case were tried he should be permitted to introduce parol evidence for the purpose of showing an agreement on the part of the buyer to purchase approximately 1,600 valves. The formal agreement contained in purchase order 11925 purports to be a final and complete agreement. A provision therein contained so recites. Parol evidence of this character would vary and contradict the terms of the agreement, and such evidence is inadmissible.

Professor Fuller, in a note to Alexander Hamilton Institute v. Jones, 234 Ill. App. 444, heretofore cited by us, discussing insurance and correspondence school contracts, says:

498

"One often has the impression of a kind of running battle between draftsmen and the courts, with much shifting of ground on the part of both.

"Back of this development lies a problem that touches the basic philosophy of contract law. The law of contracts is founded generally on the principle that it is the business of the courts to interpret and enforce the agreements that the parties have negotiated. This theory confronts the social reality that in many cases no real negotiations take place, and the terms of the contract are in fact set by the will of one party alone. This situation may arise where one party is indifferent or ignorant, or it may result from a superiority of bargaining power on one side. In such situations, there seems to be emerging a principle of law not yet frankly acknowledged which might be phrased something as follows: where one party to a contract has the power to dictate its terms, the terms of the contract are subject to judicial review, and may be modified by the court if they are unduly harsh."

Fuller, Basic Contract Law, p. 260.

The courts have many times passed on cases involving insurance contracts, which in many respects are similar to the agreement in this case. Concerning such cases it has been said:

"The history of the cases is, very largely, the history of a struggle between the insurance companies and the courts. . . . The courts, endeavoring to compel fair play, but trammelled and often thwarted by the stringent terms of the contracts, have devised doctrines and asserted principles which are sometimes more creditable to the ingenuity and subtlety of the judges than easily harmonized with decisions rendered, under less violent bias, in other departments of the law."

Ewart's Waiver Distributed, Chap. 9, p. 192.

The agreement contained in purchase order No. 11925 was artfully prepared. It contains, in print so

fine as to be scarcely legible, more than 23 clauses, most of which are applicable to bilateral contracts. It has all the indicia of a binding and enforceable contract, but it was not a binding and enforceable contract because the promise was defective. Behind the glittering facade is a void. This agreement was made in the higher echelons of business, overshadowed by the aura of business ethics. To say the least, the agreement was deceptive. In a more subterranean atmosphere and between persons of lower ethical standards it might, without any strain on the language, be denominated by a less deterged appellation.

Nevertheless, as the law is today, on the pleadings in the instant case, the trial court could do nothing but sustain the motion to dismiss the complaint. The judgment of the circuit court is affirmed.

Judgment affirmed.

ROBSON and SCHWARTZ, JJ., concur.